985 F.2d 1502
 Millard McKINNEY, Plaintiff-Appellant,
v.
John PATE, individually and in his official capacity as
Commissioner of the Osceola County Board of Commissioners,
Jack Shannin, individually and in his official capacity as
Development Dept. Director of Osceola County, and the
Osceola County Board of Commissioners, collectively,
Defendants-Appellees.
 No. 91-3416.
 United States Court of Appeals,
Eleventh Circuit.
 March 17, 1993.
 
 Thomas J. Pilacek, Longwood, FL, for plaintiff-appellant.
 Lewis E. Shelley, Tallahassee, FL, Neal D. Bowen, Kissimmee, FL, for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before TJOFLAT, Chief Judge, and FAY and COX, Circuit Judges.
 FAY, Circuit Judge:
 
 
 1
 Millard McKinney, the former Osceola County Building Official, appeals the district court's order setting aside the jury verdict in his favor because there was substantial evidence to support his claim that the Osceola Board of County Commissioners [hereinafter "the Board"] violated his right to substantive due process by terminating him without cause. In opposition, the Board[1] asserts that the question of whether there is a violation of McKinney's rights under substantive due process is a question of law for the court. It further argues that if the court finds evidence to support a rational basis for the Board's decision to terminate Mr. McKinney, it must enter judgment in favor of the defendant Board, notwithstanding the jury's verdict. We find the district court erred in setting aside the verdict in favor of McKinney. Accordingly, the district court's order is VACATED and the judgment in favor of McKinney is reinstated.
 
 I. Facts
 
 2
 Millard McKinney was hired as the Osceola County Building Official on July 27, 1987. The Building Official is the head of the Building Division, one of three divisions within the Osceola County Development Department. The parties agree that both the Building Division, and the Development Department as a whole, were the target of complaints from the public and that the Board had been investigating ways to improve the public's perception and the performance of these departments. McKinney testified that he was hired with a mandate to address some of the problems the Building Division had experienced, specifically laxity in enforcement of the building codes, and that he successfully brought about needed reforms and improvements.
 
 
 3
 In the spring of 1988, almost a year after McKinney was hired, at least two "workshops," or public hearings, were held to discuss on-going problems in the Development Department, including the Building Division. McKinney asserts that these problems were "the same as in any Building Division anywhere." Appellant's Brief at 5. The Board, in contrast, asserts that these workshops were held in response to complaints about McKinney and constitute evidence of his poor performance. The undisputed evidence is that, whatever the source of the problems leading to the public hearings, McKinney's performance reviews before and after these hearings were uniformly excellent. Undisputed also is that the Osceola County Policy Manual in effect at the time, and applicable to McKinney, provided that permanent employees such as McKinney could only be terminated for cause and in accordance with the procedures established therein.
 
 
 4
 Mr. McKinney's direct supervisor was Jack Shannin. Shannin, in turn, reported to Eleanor Anderson, the County Administrator, who reported directly to the Board of County Commissioners. In November of 1988, three new members were elected to that Board. Jack Pate was one of these new commissioners. Shortly after the election, Anderson testified that the new Board met to discuss needed changes in the Building Division, although at trial the Board members denied that any such meeting took place. The upshot of the alleged meeting, as Anderson testified she understood it, was that McKinney was to be terminated. She in turn instructed Jack Shannin, her subordinate, to fire McKinney. Shannin testified that he twice asked for McKinney's resignation in compliance with Anderson's instructions. It is undisputed that the formal requirements or procedures of the policy manual were not followed in connection with this request. Indeed, McKinney testified that he was not given any reason for his requested resignation other than that the commissioners wanted it.[2] When McKinney protested that Shannin had no reason to fire him, McKinney testified, that Shannin replied, "I don't have anything. But I'll get something." R3-55-132.
 
 
 5
 In January of 1989, Shannin and Anderson met with McKinney and gave him a list of the reasons for his proposed termination. Immediately thereafter, on three non-consecutive days, hearings regarding these charges were held before the Board itself, instead of the Personnel Committee as provided for by the county's policies. McKinney presented evidence to refute the charges and challenged the validity of some of the testimony as being unverified or motivated by personal animus. Nevertheless, on February 1, 1989 the Board entered a finding that McKinney's termination was justified on the basis of the evidence it heard.[3] McKinney was terminated and this suit ensued.
 
 
 6
 The crux of McKinney's argument is that the reasons given for his termination were pretextual, and that the hearing was held in an attempt to disguise the Board's illegitimate motives with an appearance of regularity. McKinney suggests those motives were that some Board members, in particular Mr. Pate, were unhappy with him because he was enforcing the code as required. McKinney claims that Pate had ties to contractors who were unhappy because they wanted special treatment, waivers and exemptions to which they were not entitled.
 
 
 7
 There is substantial evidence to support this claim. Mr. Pate was formerly employed in the Building Division. Prior to McKinney's arrival, Pate had been rejected for the position ultimately awarded to McKinney. Pate was also employed by a dry wall subcontractor whose work, in the normal course of business, was inspected by McKinney's department.[4] Most significantly, both before and after his election to the Board, Pate approached McKinney regarding projects with code violations, although the nature and extent of his intervention is in dispute.[5] Despite the substantial evidence in support of McKinney's claim and the jury verdict in his favor, the district court granted the Board's motion for a judgment notwithstanding the verdict.[6]
 
 II. Standard of Review
 
 8
 Motions for judgments notwithstanding the verdict are subject to de novo review. Hessen v. Jaguar Cars, Inc., 915 F.2d 641, 644 (11th Cir.1990). The reviewing court therefore applies the same standard in such cases as the district court is required to apply. Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir.1989).
 
 
 9
 [W]e consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party. If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted. Conversely, if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion was due to be denied and the case was properly submitted to the jury.
 
 
 10
 Id. at 581 (citations omitted). Under this standard "there must be a substantial conflict in the evidence to support a jury question." Id. at 581.
 
 
 11
 The evidence in this case reflected such a conflict. Indeed, even though the balance of the evidence probably favored McKinney, the conflict in the evidence was sufficient to deny McKinney a directed verdict, had he asked for it. Accordingly, a judgment notwithstanding the verdict in favor of the Board was inappropriate where the jury had resolved the disputed factual issues in McKinney's favor. The Board attempts to avoid this result by arguing that the issue of whether McKinney's rights of substantive due process were violated is to be decided by the judge, and further, that the existence of any evidence to support its termination of McKinney compels the court to rule in its favor. This argument, as will be demonstrated below, is not supported by the law.
 
 III. Substantive Due Process
 
 12
 McKinney asserts that, pursuant to county policy, he could only be discharged for cause, and that instead his discharge was founded on illegitimate motives. This action he claims deprived him of a protected property interest in his job without substantive due process.[7] It is well settled that such claims state "a substantive due process violation--deprivation of a property interest for an improper motive and by means that were pretextual, arbitrary and capricious, and ... without any rational basis." Hearn v. City of Gainesville, 688 F.2d 1328, 1332 (11th Cir.1982). See also Adams v. Sewell, 946 F.2d 757, 766 (11th Cir.1991); Barnett v. Housing Authority of Atlanta, 707 F.2d 1571, 1577 (11th Cir.1983). The distinguishing feature of such claims, in contrast to procedural due process claims, is "that certain governmental conduct would remain unjustified even if it were accompanied by the most stringent of procedural safeguards." Gilmere v. City of Atlanta, 774 F.2d 1495, 1500 (11th Cir.1985) (en banc ), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).
 
 
 13
 For its argument that this case did not present a jury question, the Board relied on Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1578 n. 15 (11th Cir.1989), reh'g denied, en banc, 893 F.2d 346 (1989). Greenbriar was a zoning case where the plaintiffs argued that a zoning regulation deprived them of substantive due process. In Greenbriar we noted that the enactments of legislative or quasi-legislative bodies, such as a zoning board, " 'are entitled to a presumption of validity.' " Id. at 1577 n. 14 (citing Couf v. DeBlaker, 652 F.2d 585, 588 (5th Cir. Unit B 1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982)). In that context, we held that the "ultimate issue of whether a zoning decision is arbitrary and capricious is a question of law to be determined by the court." Id. at 1578.
 
 
 14
 The Board argues, pursuant to Greenbriar, all substantive due process questions are to be submitted to the judge and, further, it appears to rely on the presumption of validity discussed in Greenbriar to argue that if there is any evidence to support its position that McKinney's firing was not arbitrary and capricious, then it is entitled to judgment in the Board's favor. The Board misperceives the nature of the rule and the discussion in the Greenbriar case.
 
 
 15
 It is one thing to presume that a rule or statute of general applicability is not arbitrary and capricious. It is quite another to make such a presumption where the government action disproportionately affects one person. This is not to say that whenever an official government entity discharges an employee that it may not be acting in the public interest. Theoretically, all of the government's actions are in the public interest. However, actions that are of general applicability, on their face, raise fewer concerns about improper motives than actions directed at one person. Presumably, the very purpose of the "for cause" provision in the County Policy Manual is to insulate non-elected, public employees from illegitimate political pressure and retaliation, in recognition of the fact that hiring and firing decisions potentially raise troubling questions of motive in ways that ordinary rule-making and legislation do not.
 
 
 16
 In addition, by their nature, zoning regulations or laws must be analyzed in part on the basis of their wording, a task for which the judge is particularly suited as this is the familiar exercise of statutory interpretation. Regulations may or may not be facially neutral. Moreover, collateral facts, found by a jury, may indicate that a facially impartial regulation is not impartial in fact. In contrast, the act of terminating an employee for illegitimate reasons has already been deemed a violation of substantive due process. See, e.g., Adams v. Sewell, 946 F.2d at 766. The only thing left to be determined is whether, in a particular case, the facts support such a conclusion. This purely factual inquiry is the province of the jury.
 
 
 17
 The jury here had to answer two questions.[8] The first was whether there was substantial evidence to support the Board's proffered grounds for discharging Mr. McKinney.[9] The jury answered this question in the negative. The second question was whether the jury believed McKinney's claim that his firing was founded on illegitimate motives.[10] It answered this question in the affirmative and awarded McKinney $145,000.00 on his claim. While there were certainly disputed points, the evidence was clearly such that reasonable people could reach different conclusions as to what had occurred. Where the evidence is such that reasonable people could differ, the issue is appropriately resolved by a jury and the judge is not free to substitute his or her opinion for that of the jury. Thus, the district court's ruling setting aside McKinney's judgment was clearly erroneous and is vacated.[11]
 
 IV. Accrual of Interest
 
 18
 Although the district court's order setting aside the jury verdict indicated that a judgment for the Board, consistent with its order, would be forthcoming, no such judgment was ever entered. Thus, the only judgment in this case was entered in favor of McKinney on March 21, 1991. With the reversal of the court's order setting that verdict aside, the judgment for McKinney is automatically reinstated as of the date of entry. Therefore, interest should accrue from the date of the original judgment.
 
 V. Conclusion
 
 19
 For the foregoing reasons we vacate the district court's order setting aside the jury verdict. As the judgment in favor of McKinney has already been entered that judgment is hereby reinstated and the matter is remanded to the district court for entry of the appropriate orders.
 
 
 20
 VACATED and REMANDED.
 
 
 21
 TJOFLAT, Chief Judge, specially concurring in which COX, Circuit Judge, joins:
 
 
 22
 Because we are bound by circuit precedent,[1] I concur in the judgment of the court. I write separately to express my increasing concern regarding the divergence of this circuit's substantive due process jurisprudence from that of the Supreme Court.[2]
 
 
 23
 This case illustrates our fundamental failure to distinguish between procedural and substantive due process. While the Supreme Court has used substantive due process as a means of recognizing fundamental rights "implicit in the concept of ordered liberty," the Eleventh Circuit has strayed from this narrow path and created for state or local employees a "substantive" right not to be terminated for pretextual reasons even where state procedures exist which would correct the injustice and make them whole.
 
 
 24
 I will first survey the circuit law on pretextual termination, then examine the due process jurisprudence of the Supreme Court. Concluding that circuit doctrine no longer complies with High Court precedent, I will suggest that these pretextual termination cases implicate only procedural guarantees.
 
 I.
 
 25
 The Eleventh Circuit has considered a number of "substantive" due process employment termination cases in the last ten years.[3] The first clear indication that we would recognize a substantive due process violation for the pretextual termination of a state employee came in Hearn v. City of Gainesville, 688 F.2d 1328 (11th Cir.1983). The Hearn panel found that the Due Process Clause was implicated when the head of the city's personnel department arranged the elimination of the plaintiff's position in order to terminate him without cause:
 
 
 26
 [T]he layoff was a phony arrangement, carried out for an improper motive, to deprive Hearn of his job. This states a substantive due process violation--deprivation of a property interest for an improper motive and by means that were pretextual, arbitrary and capricious, and, because unrelated to the proper reasons for layoff, without any rational basis.
 
 
 27
 Id. at 1332 (citing Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940 (1933) ("the guaranty of due process ... demands ... that the law shall not be unreasonable, arbitrary or capricious")).
 
 
 28
 A second panel visited the issue some six months later in Barnett v. Housing Authority of Atlanta, 707 F.2d 1571 (11th Cir.1983). The plaintiff asserted that his termination was an attempt "to make him a sort of scapegoat" in response to an incident which embarrassed the Board of Commissioners of the Atlanta Housing Authority. The court affirmed the judgment entered on the jury verdict in the plaintiff's favor, finding the pretextual nature of the firing to be a violation of the plaintiff's substantive due process rights. Id. at 1577-78.
 
 
 29
 The rule was applied most recently in Adams v. Sewell, 946 F.2d 757 (11th Cir.1991). In that case, the panel found a substantive due process violation where a county alleged "improper management techniques" as the basis for discharge rather than admit that the employee was being fired because of allegations that he had sexually harassed another employee. Id. at 766-67.
 
 
 30
 The Eleventh Circuit law of "substantive" due process in the government employment setting is clear, albeit misguided. "A violation of a public employee's right to substantive due process occurs when an employer deprives the employee of a property interest for an improper motive and by means that [are] pretextual, arbitrary and capricious, regardless of whether or not a hearing was held." Nolin v. Douglas County, 903 F.2d 1546, 1553-54 (11th Cir.1990) (internal quotation marks omitted); see Barnett, 707 F.2d at 1577; Hearn, 688 F.2d at 1332; see also Adams, 946 F.2d at 766; Kelly v. Smith, 764 F.2d 1412, 1413 (11th Cir.1985). The plaintiff must show (1) a deprivation of a state law property right in continued employment (2) made through pretextual means to disguise an improper motive.
 
 
 31
 Satisfaction of these requirements will not make out a substantive due process claim under the jurisprudence of the Supreme Court, however. Only procedural issues are implicated. Whether an individual complains that a state lacks constitutionally adequate procedures for termination of employees or asserts that his particular hearing was not fair and impartial, he has raised only procedural due process concerns.
 
 II.
 
 32
 The Due Process Clause of the Fourteenth Amendment provides "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Notwithstanding the oxymoronic consequence,[4] it is well-settled that the clause has both procedural and substantive content. See Planned Parenthood v. Casey, --- U.S. ----, ----, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992) ("Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least 105 years ... the Clause has been understood to contain a substantive component as well...."); see also Daniels v. Williams, 474 U.S. 327, 337, 106 S.Ct. 662, 677, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring in the judgment) (noting that "the Due Process Clause of the Fourteenth Amendment ... is the source of three different kinds of constitutional protection": procedural due process, substantive due process, and incorporation); Burch v. Apalachee Community Mental Health Servs., Inc., 840 F.2d 797, 800 (11th Cir.1988) (same), aff'd sub nom. Zinermon v. Burch, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The Due Process Clause guarantees that a state may not effect a deprivation of life, liberty, or property without certain procedural safeguards. While this guarantee of procedural due process is the core meaning of the clause, the Court has endorsed two substantive interpretations of the clause as well. The first substantive interpretation is that the clause selectively incorporates provisions of the Bill of Rights, and protects these rights against infringement by state and local governments.[5] The second substantive interpretation is that the clause bars "certain government actions regardless of the fairness of the procedures used to implement them." Daniels, 474 U.S. at 331, 106 S.Ct. at 665.
 
 A.
 
 33
 This last guarantee, that of substantive due process, "prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.' " United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) (quoting Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), and Palko v. Connecticut, 302 U.S. 319, 325-26, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)).[6] When the Supreme Court invokes substantive due process, it does so to protect a "fundamental interest" or otherwise to preclude the abusive exercise of government power.
 
 
 34
 Thus, in its most recent examination of substantive due process, the Court considered the case of a city employee who died of asphyxia after entering a manhole to unstop a sewer line. Collins v. City of Harker Heights, --- U.S. ----, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). His widow alleged that the city had violated her husband's substantive due process right to life by sending him into the manhole. Justice Stevens, writing for a unanimous Court, observed that
 
 
 35
 Fairly analyzed, her claim advances two theories: that the Federal Constitution imposes a duty on the city to provide its employees with minimal levels of safety and security in the workplace, or that the city's "deliberate indifference" to Collins' safety was arbitrary Government action that must "shock the conscience" of federal judges.
 
 
 36
 Id. at ----, 112 S.Ct. at 1069. The Court rejected both claims, terming the proposed constitutional right "unprecedented" and declining to find the action "arbitrary, or conscience-shocking, in a constitutional sense." Id. at ----, 112 S.Ct. at 1069-70.
 
 
 37
 The issue implicated by the instant case is the extent to which substantive due process, as opposed to procedural due process, serves to protect state-created contract rights, particularly employment rights. Though the Supreme Court has not decided this precise issue, in Harker Heights, Justice Stevens reminded us:
 
 
 38
 [T]he Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.
 
 
 39
 Id. at ----, 112 S.Ct. at 1068 (citation omitted).[7]
 
 
 40
 The Supreme Court has been unwilling to use substantive due process to "constitutionalize" traditional areas of state law. Again, just last term the Court reiterated this point:
 
 
 41
 Because the Due Process Clause "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society," we have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law. The reasoning in those cases applies with special force to claims asserted against public employers because state law, rather than the Federal Constitution, generally governs the substance of the employment relationship.
 
 
 42
 Id. at ----, 112 S.Ct. at 1070 (quoting Daniels, citations omitted); see also Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 229, 106 S.Ct. 507, 515, 88 L.Ed.2d 523 (1985) (Powell, J., concurring) ("While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution.").
 
 
 43
 Thus, when the High Court has applied the doctrine of substantive due process, it has done so only to protect those rights that have been held to be fundamental to our democratic society. Substantive due process is not invoked to protect less elemental interests. The present case does not implicate these sorts of rights. The High Court's doctrine of substantive due process is not applicable.
 
 B.
 
 44
 Under the Supreme Court's due process jurisprudence, this case implicates only the procedural guarantees of the Fourteenth Amendment. When the Supreme Court has considered due process claims in the context of the termination of state employees, it has generally analyzed them as procedural due process cases. Once an employee has established an entitlement to continued employment under state law, the Court has been willing to invoke procedural guarantees from the Fourteenth Amendment. The companion cases of Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), first articulated the contours of due process protection for government employees.
 
 
 45
 Roth was an assistant professor hired by a Wisconsin state university under a single one year contract. He claimed that his procedural and substantive due process rights had been violated when the university did not offer him a second contract. The Court disagreed. The Court recognized that the liberty guaranteed by the Due Process clause was broad--"generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men"--but declined to find a liberty interest in being rehired after the expiration of a contract. Roth, 408 U.S. at 571-73, 92 S.Ct. at 2706-07. The Court also declined to find that Roth had a protectable property interest in being rehired: "Property interests, of course, are not created by the Constitution. Rather they are defined by existing rules or understandings that stem from an independent source such as state law...." Id. at 577, 92 S.Ct. at 2709. Since neither state law nor the terms of the contract gave Roth a property interest in being rehired, he was not entitled to procedural due process protections.
 
 
 46
 In Perry v. Sindermann, however, the Court refused to affirm a summary judgment in favor of a University's Board of Regents in a similar factual setting. The dispositive difference was that Sindermann, unlike Roth, was able to point to various documents and practices which might support his claim that there was an implied contract granting him tenure under state law. Sindermann, 408 U.S. at 599-603, 92 S.Ct. at 2698-2700. The Court concluded that proof of such a property interest would entitle Sindermann to a postdeprivation hearing. Id. at 603, 92 S.Ct. at 2700.
 
 
 47
 Neither Roth nor Sindermann derived a constitutionally protectable interest from the Fourteenth Amendment. Instead, the Court looked to "independent source[s] such as state law" to establish an interest protected under procedural due process. Roth, 408 U.S. at 577, 92 S.Ct. at 2709; cf. Sindermann, 408 U.S. at 601-02, 92 S.Ct. at 2769-70.
 
 
 48
 The Court considered similar facts four years later in Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). There, a police officer terminated without a hearing claimed that he had been deprived of both property (his employment status) and liberty interests (freedom from public stigma, freedom from pretextual termination). The Court first examined state law to conclude that the policeman had no property interest protected under the Fourteenth Amendment. Id. at 344-47, 96 S.Ct. at 2077-79. The Court then turned to the policeman's asserted liberty interest and reasoned that the right to be free from public stigma could not arise where the reasons for termination were not made public. Id. at 348-49, 96 S.Ct. at 2079. Finally, the Court was unsympathetic to the claim that the termination was pretextual:
 
 
 49
 The truth or falsity of the City Manager's statement determines whether or not his decision to discharge the petitioner was correct or prudent, but neither enhances nor diminishes petitioner's claim that his constitutionally protected interest in liberty has been impaired.
 
 
 50
 Id. at 349, 96 S.Ct. at 2079-80. The Court went on to suggest that
 
 
 51
 Indeed, the impact on petitioner's constitutionally protected interest in liberty is no greater even if we assume that the City Manager deliberately lied. Such fact might conceivably provide the basis for a state-law claim, the validity of which would be entirely unaffected by our analysis of the federal constitutional question.
 
 
 52
 Id. at 349 n. 13, 96 S.Ct. at 2080 n. 13 (emphasis added). The Court concluded by rejecting the idea that the Fourteenth Amendment provides for the substantive review of state employment decisions:
 
 
 53
 The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.
 
 
 54
 Id. at 349-50, 96 S.Ct. at 2080 (footnote omitted).[8]
 
 
 55
 More recently, the Supreme Court considered two consolidated cases in which the terminated employees had been " 'classified civil service employees,' entitled to retain their positions 'during good behavior and efficient service,' who could not be dismissed 'except ... for ... misfeasance, malfeasance, or nonfeasance in office.' " Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-39, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985) (quoting Ohio Rev.Code Ann. §§ 124.11 & 124.34 (1984)). The Court concluded that the employees "had a property right in continued employment," and were thus entitled to the protections of procedural due process. Id. at 538, 541, 105 S.Ct. at 1491, 1493.
 
 
 56
 In the case before us, state law granted McKinney a similar protectable property interest in his job. The jurisprudence of the High Court suggests that McKinney thus had a property right which was fully protected by the requirements of procedural due process. See Loudermill, 470 U.S. at 541, 105 S.Ct. at 1493.[9] The Constitution guards McKinney's property right in his job, not against termination as such, but against termination without due process of law. This is a procedural guarantee, not a substantive one.
 
 
 57
 In sum, the Supreme Court employs procedural due process to provide protection for employment entitlements created by state law, and reserves substantive due process to protect those property or liberty interests that are incorporated by the Fourteenth Amendment or otherwise recognized as "fundamental" to our democratic society.
 
 III.
 
 58
 The difference between substantive and procedural due process is not just semantic. Had the Board of County Commissioners deprived McKinney of some substantive due process claim, he would have a federal cause of action. As it is, he can only allege that he was subjected to an unfair proceeding, and since he did not pursue the available state-provided remedies (and he does not allege that these remedies were inadequate), he has suffered no constitutional deprivation. For this reason, he fails to state a claim under 42 U.S.C. § 1983 (1988).
 
 
 59
 McKinney alleged a violation of section 1983, which providesEvery person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....
 
 
 60
 Thus, McKinney must establish two elements: (1) that the conduct complained of was committed under color of state law, and (2) that the conduct deprived the plaintiff of federal constitutional or statutory rights. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 330-31, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). McKinney claimed that the Board, acting under color of state law, violated his constitutional right to "substantive" due process, by failing to provide him with a fair hearing before an unbiased decisionmaker.[10]
 
 
 61
 Notwithstanding our decisions in Hearn, Barnett, and Adams, his allegations go to procedural concerns, not substantive ones.[11] By alleging that the Osceola Board of County Commissioners terminated him for illegitimate reasons, McKinney stated a claim that he was denied procedural due process. When his claim is thus recast, it is clear that he has brought it in the wrong court.
 
 
 62
 In reviewing an alleged denial of procedural due process, we must ask "What procedure was due, but not received?" McKinney argues that he was entitled to a fair tribunal. So he was. In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). Indeed, state law provided him with a means of vindicating that right through review by a civil service board or state circuit court. Florida provided a means of review for procedural irregularities by the Board of County Commissioners. Cf., e.g., Elder v. Highlands County Bd. of County Comm'rs, 497 So.2d 1334 (Fla.Dist.Ct.App.1986); Seminole County Bd. of County Comm'rs v. Long, 422 So.2d 938 (Fla.Dist.Ct.App.1982); West v. Board of County Comm'rs, Monroe County, 373 So.2d 83 (Fla.Dist.Ct.App.1979). McKinney did not claim that his state remedies were inadequate.
 
 
 63
 Although "overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983," a violation of federal procedural due process is not complete
 
 
 64
 when the deprivation occurs; it is not complete unless and until the State fails to provide [procedural] due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.
 
 
 65
 Zinermon v. Burch, 494 U.S. 113, 123, 125, 110 S.Ct. 975, 982, 983, 108 L.Ed.2d 100 (1990). Where an adequate state law remedy is provided to vindicate federal due process rights, there can be no denial of procedural due process, and thus no constitutional violation.
 
 
 66
 Assuming McKinney's allegations to be true, he is the victim of an illegal kangaroo court. Since such a proceeding was admittedly random and unauthorized, and since the state provided him with an adequate remedy,[12] McKinney has no federal claim. See Parratt, 451 U.S. at 542, 101 S.Ct. at 1916 ("[T]he existence of an adequate state remedy to redress property damage inflicted by state officers avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment." (quoting Bonner v. Coughlin, 517 F.2d 1311, 1319 (7th Cir.1975))). As the High Court has observed, "The state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct." Hudson v. Palmer, 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984).
 
 
 67
 I conclude that McKinney has failed to state a claim for relief under 42 U.S.C. § 1983. His remedy is in state, not federal, court.
 
 IV.
 
 68
 Were it not for Hearn and its progeny, I would direct the district court to dismiss McKinney's claim. Nevertheless, the wayward jurisprudence of our circuit is a clear, though errant, guide. We must follow it until we review the issue en banc.
 
 
 
 [1]
 McKinney voluntarily dismissed his action against the defendants John Pate and Jack Shannin in their individual capacity. Therefore, the Osceola Board of County Commissioners is the only defendant remaining in this appeal
 
 
 [2]
 The county's employment policy required written notice and an opportunity to improve before a permanent employee could be fired
 
 
 [3]
 The Board specifically noted that its decision to terminate McKinney was not based on the alleged conflict of interest arising from McKinney having had employees under his supervision inspect the construction of his private residence. Now the Board claims that this fact was crucial to its decision. At trial the commissioners testified that this "conflict" was a significant factor in their decision, despite their assertion at the time that the issue of McKinney's house was not the reason for their decision. The district court also apparently found this "conflict" very significant. R1-47-4. We are not so impressed with the gravity of this charge. Indeed, the inordinate emphasis placed on this "conflict" tends to support McKinney's case rather than that of the Board
 First, the advisory opinions from the Florida Commission on Ethics clearly illustrate that the Florida statute, § 112.313(7)(a), which the Board claims prohibits McKinney from having his home inspected by members of his own department, is directed at public officials who have business interests which conflict with their public duties. See R1-39, Attachments, Op. 81-20 (dated April 2, 1981) & Op. 81-51 (dated September 17, 1981). Thus, it is debatable whether the statute was meant to apply in the construction of a private residence because any interest McKinney may have in cutting costs by skirting the code would seem to be offset by the fact that he bears the risk of loss or injury if the building fails to meet code specifications. Second, it is undisputed that the division had no specific policy to deal with such conflicts. Third, there is substantial evidence that numerous similar, if not more egregious, conflicts arose with other members of the department and the commission and did not occasion comment, let alone dismissal, of those individuals.
 
 
 [4]
 This is only one of the many apparent or potential conflicts of interest, revealed by the evidence, that apparently have not occasioned any comment or censure
 
 
 [5]
 McKinney testified that Pate approached him on behalf of the contractors involved in various jobs in an attempt to get McKinney to waive or overlook code violations. Pate's testimony on this point is conflicting. Initially, he acknowledged approaching McKinney regarding some of these jobs and acting on behalf of the contractors involved. Later he denied that he acted on their behalf, or that he was attempting to get McKinney to use his discretion in their behalf, but he did not offer any concrete alternative explanation for his actions regarding these projects
 
 
 [6]
 The district court's order is rather general and conclusory. Therefore, the basis for its conclusion that the "conflicting evidence" compelled a judgment in the Board's favor is unclear. In the absence of other grounds, we assume the court relied on the arguments of the Board's counsel and that its reasoning corresponds to that advanced by the Board
 
 
 [7]
 The issue of whether an employee has a protected property interest in his job is a matter of state law. Barnett v. Housing Authority of Atlanta, 707 F.2d 1571, 1576 (11th Cir.1983). Florida courts have held public employees have such an interest when they have a right to be discharged only for cause. See, e.g., West v. Board of County Comm'r., 373 So.2d 83, 85-86 (Fla. 3rd DCA 1979)
 
 
 [8]
 Although the Board objected to the jury interrogatories at trial, they have not cross-appealed this issue so it is waived
 
 
 [9]
 The question read: "Was there substantial evidence that the plaintiff was fired because of incompetent or inefficient performance of the duties of the office?" R1-41-1
 
 
 [10]
 The question read: "Was the plaintiff fired because of political or personal animosity because of plaintiff's enforcement of the building codes?" R1-41-1-2
 This question requires some clarification. The gravamen of McKinney's complaint is that he was fired because certain commissioners wanted to continue a practice of lax enforcement of the building codes as an improper concession to commercial developers and contractors. He characterizes this as a "political" motive. Here "political" must be read with the qualifier "improper," because "political" cannot mean "improper" in all cases. Sometimes the "just cause" for a dismissal may have its roots in the political. For example, a public employee who is so unpopular that he is ineffective is in danger of termination for cause. Ultimately, however, the "cause" is his ineffectiveness, not his unpopularity. In this case, although the Board attempted to argue that McKinney was ineffective, and therefore dismissed with cause, the jury found the weight of the evidence did not support the Board's position. This question might have been more clearly worded to emphasize that "political" did not invariably mean "improper," although that was its meaning in the context of this case.
 
 
 [11]
 The Board argues that this case should be remanded for a new trial should we find the district court's order was erroneous. However, although the Board argued this in its original motion for a judgment notwithstanding the verdict, it did not cross-appeal the issue. The failure to cross-appeal renders this point waived and without merit
 
 
 [1]
 Per Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), a prior panel's holdings can only be overruled by the court sitting en banc
 
 
 [2]
 I do not dispute the unfortunate endurance of substantive due process. It has outlasted many, though not all, of its critics. See, e.g., Boddie v. Connecticut, 401 U.S. 371, 392-93, 91 S.Ct. 780, 793-94, 28 L.Ed.2d 113 (1971) (Black, J., dissenting) ("With a 'shock the conscience' test of Constitutionality, citizens must guess what is the law, guess what a majority of nine judges will believe fair and reasonable. Such a test wilfully throws away the certainty and security that lies in a written constitution, one that does not alter with a judge's health, belief, or his politics."); Lochner v. New York, 198 U.S. 45, 75-76, 25 S.Ct. 539, 547, 49 L.Ed. 937 (1905) (Holmes, J., dissenting) ("[T]he accident of our finding certain opinions natural and familiar, or novel, and even shocking, ought not conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States."). Others have found themselves, however reluctantly, persuaded that substantive due process is here to stay. See, e.g., Moore v. City of East Cleveland, 431 U.S. 494, 544, 97 S.Ct. 1932, 1959, 52 L.Ed.2d 531 (1977) (White, J., dissenting) ("[T]he Court should be extremely reluctant to breathe still further substantive content into the Due Process Clause so as to strike down legislation adopted by a State or city to promote its welfare. Whenever the Judiciary does so, it unavoidably preempts for itself another part of the governance of the country without express constitutional authority."); Whitney v. California, 274 U.S. 357, 373, 47 S.Ct. 641, 647, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) ("Despite arguments to the contrary which had seemed to me persuasive, it is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure. Thus all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the states.")
 
 
 [3]
 We have resolved other, similar, cases through procedural reasoning, asking whether the employee had a state-created entitlement to the job, and if so, whether the state had provided constitutionally adequate procedures before termination. See, e.g., Lee v. Hutson, 810 F.2d 1030, 1032-33 (11th Cir.1987) (finding that allegations of numerous procedural defects did not make out a substantive due process claim)
 In teacher termination cases involving allegations of violations of both procedural and substantive due process, we have inquired "whether the procedures followed by the school authorities comported with due process requirements, and, if so, whether the action taken is supported by substantial evidence." Holley v. Seminole County Sch. Dist., 755 F.2d 1492, 1496 (11th Cir.1985) (quoting Viverette v. Lurleen B. Wallace State Junior College, 587 F.2d 191, 193 (5th Cir.1979)); cf. Hatcher v. Board of Pub. Educ., 809 F.2d 1546, 1552 (11th Cir.1987). The first prong of this test involves constitutional assessment of the procedures used to effect the termination. The second prong, a "limited substantive review," assures that there is "substantial evidence" for the decision, thus, "a rational basis for the deprivation of an individual's property." Holley, 755 F.2d at 1499. This is an appropriate, essentially procedural, review of the sufficiency of the evidence. It is unfortunate, however, that we have invited litigants to allege violations of substantive due process in order to trigger this analysis.
 
 
 [4]
 As John Hart Ely noted:
 [T]here is simply no avoiding the fact that the word that follows "due" is "process." ... Familiarity breeds inattention, and we apparently need periodic reminding that "substantive due process" is a contradiction in terms--sort of like "green pastel redness."
 Democracy and Distrust: A Theory of Judicial Review 18 (1980).
 
 
 [5]
 One might also view incorporation as a special case of substantive due process protection of fundamental rights. Justice Cardozo's famous opinion in Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937), recognized certain rights as "implicit in the concept of ordered liberty," and thus protected by the Fourteenth Amendment against state infringement. Id. at 325-26, 58 S.Ct. at 152. The selective incorporation of most of the Bill of Rights has been a progressive recognition of those liberties as fundamental. See, e.g., id. at 323-26, 58 S.Ct. at 151-53 (recognizing the incorporation of free exercise of religion, freedom of speech, freedom of press, freedom of assembly, right to petition the government, Fifth Amendment due process, right to compensation for takings, and Sixth Amendment charge and subpoena rights); Everson v. Board of Educ., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (incorporating the establishment clause); In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (incorporating the right to a public trial); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (incorporating the Fourth Amendment); Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (incorporating the Eighth Amendment prohibition on cruel and unusual punishment); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (incorporating the Sixth Amendment right to counsel); Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (incorporating the Fifth Amendment right against self-incrimination); Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (incorporating the Sixth Amendment confrontation clause); Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (incorporating the right to an impartial jury); Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) (incorporating the right to a speedy trial); Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (incorporating the right to compulsory process for obtaining witnesses); Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (incorporating the right to a jury trial in a criminal case); Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (incorporating the Fifth Amendment prohibition of double jeopardy); Schilb v. Kuebel, 404 U.S. 357, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971) (incorporating the Eighth Amendment prohibition on excessive bail). The Second, Third, and Seventh Amendments remain unincorporated, as does the Fifth Amendment provision requiring grand jury indictments in criminal cases
 
 
 [6]
 A reading of Justice Frankfurter's opinion for the Court in Rochin makes clear that this was to be one standard, not two:
 Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are "so rooted in the traditions and conscience of our people as to be ranked as fundamental" or are "implicit in the concept of ordered liberty."
 ....
 Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents--this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.
 342 U.S. at 169, 172, 72 S.Ct. at 208, 209-10 (citations omitted); cf. Baker v. McCollan, 443 U.S. 137, 147, 99 S.Ct. 2689, 2696, 61 L.Ed.2d 433 (1979) (Blackmun, J., specially concurring). The Rochin Court found the conduct of the police shocking because they violated the fundamental rights of the accused described in the Fourth Amendment.
 Those rights, however, were as yet unprotected by the Constitution against state infringement. As I have previously noted:
 Rochin was decided in 1952, nine years before the Supreme Court decided that the fourth amendment was incorporated through the fourteenth amendment so as to apply to the states. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The result in Rochin was the same result that would have been reached had the fourth amendment been applied.
 Burch, 840 F.2d at 816 n. 10 (Tjoflat, J., dissenting).
 Rochin did not purport to establish a "shocked conscience" standard of substantive due process, though Justice Black expressed a prescient concern that due process jurisprudence had been cut loose from anything other than the subjective beliefs of federal judges. See Rochin, 342 U.S. at 175-77, 72 S.Ct. at 211-12 (Black, J., concurring). The fact that a federal judge finds his personal scruples unsettled may be good cause to reflect more deeply on the rights implicated by the government action, but it should never be a surrogate for a reasoned consideration of whether a constitutional violation has occurred.
 
 
 [7]
 As Justice White wrote for an earlier Court:
 The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution. That this is so was painfully demonstrated by the face-off between the Executive and the Court in the 1930's, which resulted in the repudiation of much of the substantive gloss that the Court had placed on the Due Process Clauses of the Fifth and Fourteenth Amendments. There should be, therefore, great resistance to expand the substantive reach of those Clauses, particularly if it requires redefining the category of rights deemed to be fundamental. Otherwise, the Judiciary necessarily takes to itself further authority to govern the country without express constitutional authority. The claimed right pressed on us [to commit sodomy] today falls far short of overcoming this resistance.
 Bowers v. Hardwick, 478 U.S. 186, 194-95, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986).
 
 
 [8]
 Of course, as the Court notes, the state may not interfere with the "incorporated" liberties of its employees. See, e.g., Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (freedom of expression); Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) (freedom of political association); Sindermann, 408 U.S. at 597-98, 92 S.Ct. at 2698 (freedom of speech)
 
 
 [9]
 Nor can a state restrict substantive rights through procedural definition:
 The point is straightforward: the Due Process Clause provides that certain substantive rights--life, liberty, and property--cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards."
 Loudermill, 470 U.S. at 541, 105 S.Ct. at 1493 (quoting Arnett v. Kennedy, 416 U.S. 134, 167, 94 S.Ct. 1633, 1650, 40 L.Ed.2d 15 (1974) (Powell, J., concurring in part and concurring in the result in part)).
 
 
 [10]
 The Complaint alleged:
 Although the BOARD was supposed to act in the capacity of an impartial decision-making body, nevertheless that was impossible and did not in fact occur because:
 (a) at all times the majority of the BOARD knew that the reasons for MCKINNEY's proposed termination were false, pretextual and politically motivated and did not constitute proper cause for his discharge;
 (b) the majority of the BOARD were at all times aware of PATE's activities to secure MCKINNEY's discharge for political reasons unconnected with proper reasons for discharge, and had decided to acquiesce in PATE's desires; and
 (c) the majority of the BOARD had decided in advance of the hearing to "rubber stamp" the recommendation for termination regardless of the evidence introduced at the hearing itself.
 Record, vol. 1, no. 1 at 7.
 
 
 [11]
 One can hardly blame the litigant for being misled by our prior pronouncements in pretextual termination cases, but the incorrect label should not deter us from the proper analysis
 
 
 [12]
 He does not claim that the prescribed procedures were unfair